1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8    ANITA ARANDA and GINA BROCK,        )
                                         )
9              Plaintiffs,               )
                                         )
10        v.                             )        3:09-CV-660-RCJ-RAM
                                         )
11                                       )        **ORDER**
     RENOWN SOUTH MEADOWS MEDICAL        )
12   CENTER,                             )
               Defendant.                )
13                                       )
     _____

14
15             Currently before the Court is Defendant Renown South Meadows Medical Center's
16   ("Defendant" or "Renown") Motion for Summary Judgment (#25).  The Court heard oral
     argument on July 19, 2011.
17
                                    **BACKGROUND**
18
     **I.    Complaint**
19
               On November 10, 2009, Plaintiffs Anita Aranda and Gina Brock (collectively "Plaintiffs")
20
     filed a complaint alleging that Defendant terminated them on June 13, 2007 because of race,
21
     national origin, and in retaliation for complaining about their manager Pete Peterson's unlawful
22
     conduct.  (Compl. (#2) at 1-2).  Plaintiffs alleged that they were Asian females born in the
23
     Philippines and that ,in 2007, they were employed as housekeeper's at Defendant's medical
24
     facility in Reno.  (*Id.*).
25
               Plaintiffs filed charges of discrimination to the Nevada Equal Rights Commission
26
     ("NERC") and the Equal Employment Opportunity Commission ("EEOC") and attached copies
27
     to the complaint.  (*See* Compl. (#2) at 4-9).  The copies stated the following.  Brock filed a
28
     charge of discrimination with NERC alleging discrimination based on race, national origin, and

1  retaliation.  (*Id.* at 4).  Brock stated that, on June 13, 2007, she was discharged and that she

2  had filed a complaint with NERC on June 14, 2007.  (*Id.*).  In June 2002, Brock was hired and

3  employed by housekeeping.  (*Id.*).  On the day she was discharged, Defendant alleged that

4  she "was sleeping on duty." (*Id.*).  On the day in question, she was on her scheduled lunch

5  break with another employee.  (*Id.*).  Peterson came into the break room and ordered them

6  back to work.  (*Id.*).  Brock explained to him that they were on their scheduled break.  (*Id.*).

7  Peterson became angry and began to speak abusively.  (*Id.*).  He stated, "I hate f----g

8  [Filipinos]; I am sick and tired of you f-----g [Filipinos]." (*Id.*).

9  Aranda filed a charge of discrimination with NERC alleging discrimination based on

10  race, national origin, and retaliation.  (*Id.* at 6).  Her description of the facts were the same as

11  Brock's except for the fact that Aranda had been hired and employed by housekeeping since

12  September 2006.  (*Id.*).

13  In October 2010, Judge McQuaid granted the parties' stipulation to define Plaintiffs'

14  remaining claims for relief.  (Order (#24) at 2).  The stipulation order stated that the only

15  remaining claims were: (a) Aranda's claim for race/national origin discrimination under Title

16  VII; (b) Aranda's claim for retaliation under Title VII; (c) Brock's claim for race/national origin

17  discrimination under Title VII; and (d) Brock's retaliation claim under Title VII.  (*Id.*).

18  **II.    Summary Judgment Facts**

19  Diane Bates, the Human Resources Business Partner for Renown during 2006 and

20  2007, testified to the following at her deposition. (Bates Depo., Ex. 2 (#25-1) at 7).  Alan Olive

21  was the Administrator of South Meadows Medical Center and was considered one of Bates'

22  customers.  (*Id.* at 7-8).  In 2007, Renown had a policy that when employees were on their

23  meal periods they needed to be free from work-related interference.  (*Id.* at 8).  However, they

24  could be interrupted if needed so they had to be ready, willing, and able to return to work for

25  emergencies or for other needs during their meal period.  (*Id.*).  Prior to June 13, 2007, Bates

26  had received two reports that Plaintiffs had been sleeping outside of their meal break from

27  more than one person, including Luiz Russi, several months before hand.  (*Id.* at 9).  Bates

28  reported the incidents to Peterson because he was their manager.  (*Id.* at 9-10).  There was

2

no difference between sleeping during one's meal break and beyond one's meal break because Renown's policy stated that "sleeping while on duty is not defined on the clock or off the clock. It means while you are at work you cannot sleep." (*Id.* at 9). An employee who fell asleep on their meal break violated the rules. (*Id.*). Although the decision to terminate an employee was ultimately the manager's final decision, Bates admitted that, in the case of Plaintiffs, she "didn't leave [Peterson] much choice." (*Id.* at 10).

Pete Peterson testified to the following at his deposition. (Peterson Depo. Ex. 3 (#25-1) at 14). Peterson worked for Renown between 2003 and 2008. (*Id.* at 18). In 2005, Renown hired him as the manager of environmental services at South Meadows. (*Id.* at 21). He oversaw the housekeepers. (*Id.* at 22). Peterson reported to Alan Olive. (*Id.* at 23). Plaintiffs worked for Peterson on the night shift. (*Id.*). Peterson knew that Plaintiffs were Filipino. (*Id.*). Renown had a policy that the housekeepers had to speak English around patients unless the patient spoke Spanish. (*Id.* at 26). According to Peterson, the hospital's policy was that employees could not speak their native tongues while on break. (*Id.*). However, Peterson told his employees, both Filipino and Hispanic, that they could speak anything they wanted as long as it was not within patient earshot. (*Id.*).

Peterson testified that he had heard rumors that some of the night crew were sleeping on duty. (*Id.* at 29). He considered them rumors because he never received specific information. (*Id.*). Peterson did not recall ever catching Elvira Cano, a housekeeper, sleeping on duty. (*Id.*). He also never caught Felipe Martinez, a floor tech, sleeping on duty. (*Id.*). Because Peterson did not have positive facts that anyone was sleeping he did not act on it but told people to be careful. (*Id.*).

Peterson testified that, on June 13, 2007, sometime around midnight he came to train Plaintiffs but could not find them in their regular areas. (*Id.* at 34). He asked Allen Pilley to help him look for Plaintiffs. (*Id.*). Peterson and Pilley went upstairs to the break room. (*Id.*). Peterson "knocked on the door and . . . tried to open it [but] . . . it wouldn't open because there was something blocking the door." (*Id.*). Peterson pushed on the door and then heard Plaintiffs speaking Tagalog. (*Id.*). He asked them several times to unlock the door and come

3

out of the room because he needed to talk to them. (*Id.*).  He pushed the door open a bit more and could see furniture. (*Id.*).  Brock was covered up with a blanket and appeared to have been woken up by him. (*Id.*).  Both Plaintiffs bodies were "prone" and they had "chairs or something propped up so they could lay on it as you would an ottoman and a chair." (*Id.*).  The break room appeared dark and Peterson did not see any lights flickering. (*Id.*).  The door was well blocked because he could only push it open two to three inches. (*Id.*).  Brock's hands were under a blanket and he could not see Aranda's hands. (*Id.*).  He presumed that they had been "awoken" because they were groggy, their eyes were not focused, and they were not articulating clearly. (*Id.* at 35).

Peterson testified that he told them he would prepare verbal warnings about the incident. (*Id.* at 36).  Brock told him that "maybe we need to have a big meeting with Alan and everybody." (*Id.*).  Peterson told her that was "fine" and that they could do that but they would receive more than a verbal warning. (*Id.*).  If Peterson gave them a verbal warning he could control that, but he was concerned with the punishment Bates would impose because she would automatically be included in the conversation with Olive. (*Id.*).  When he told Plaintiffs that they could receive more than a verbal warning by talking to Olive he did not intend to dissuade them from talking to Olive. (*Id.*).  He was trying to prevent them from being fired. (*Id.*).  He did not say, "I hate f—ing Filipinos" or "sick and tired of f–ing Filipinos." (*Id.* at 37).  He made the final determination to terminate Plaintiffs based on Bates' recommendation. (*Id.* at 38).  On duty was from the time that a person punched in until the time they punched out. (*Id.*).

Anita Aranda testified to the following at her deposition.  (Aranda Depo. Ex. 4 (#25-2) at 3).  She had sent Alan Olive an email in December 2006 and then had met with him in January 2007. (*Id.* at 4, 19).  At their face-to-face meeting, she discussed her concerns about Peterson. (*Id.* at 4).  She believed that Peterson knew that she had reported him to Alan Olive because Olive had called him that same day. (*Id.* at 3).  While she met with Olive, Olive told his secretary to have Peterson come in. (*Id.*).  Aranda did not witness the conversation between Peterson and Olive but she saw Peterson walk into Olive's office. (*Id.*).  She wanted

to discuss Peterson's "write-up" about her to Olive. (*Id.* at 4). Peterson wrote her up for not speaking English and for being one minute late. (*Id.* at 5). The write-up was going to extend her 90-day probation period for another six months. (*Id.* at 4). Olive told Aranda that the write-up was "nothing" and tore it up. (*Id.* at 5). Peterson had written her up because she and another person were speaking Tagalog in the cafeteria. (*Id.*). Peterson told her, "How many times we have told you that if you are in the public, anywhere you are, you are supposed to speak English?" (*Id.*). The cafeteria was open to the public. (*Id.*). Her probation period was not extended after her meeting with Olive. (*Id.* at 6). During her meeting with Olive, Aranda discussed Peterson's "abusive" behavior at meetings which included telling his employees that they had to speak English, warning them that they had to be careful because people were watching, and hitting his fists on the table. (*Id.*). The meetings included Filipinos, Mexicans, and another Asian employee. (*Id.*). Peterson imposed the English requirement on everybody including Mexicans and Filipinos. (*Id.* at 7).

Aranda testified that Peterson discriminated against her based on her national origin as demonstrated by his comment about Filipinos on June 13th. (*Id.* at 16). He did not call her any names before that. (*Id.*). Aranda's retaliation claim was based on Peterson firing Plaintiffs after Brock had said, "Let's go to Alan Olive so we can resolve this problem." (*Id.*). Peterson had responded, "Well, going to Alan Olive I guarantee you that you will lose your job" and then they were fired. (*Id.*). Plaintiffs never had a chance to go to Olive because they already had been fired. (*Id.*). Brock's statement was her only basis for her retaliation claim. (*Id.* at 17). Aranda alleged that Peterson discriminated against everybody who was not white. (*Id.*).

On June 13th, Plaintiffs had been taking a break when Peterson tried to push the door open and said, "Get out, ladies." (*Id.* at 21). They started speaking in Tagalog and Peterson heard them. (*Id.*). They came out, two to three minutes later, after they heard Peterson speaking to someone else. (*Id.*). When they came out Peterson kept telling them that "sleeping on the job is automatic dismissal." (*Id.*). Peterson asked who was sleeping? (*Id.*). Brock said that she had been drinking coffee. (*Id.* at 21-22). Peterson responded that both of them had been sleeping. (*Id.* at 22). Brock then suggested "let's go ahead and let's go to

1  Alan Olive . . . and discuss this problem." (*Id.*). Peterson responded that "Going to Alan Olive

2  is – you could lose your job." (*Id.*). Brock stated they had to take a chance. (*Id.*). Peterson

3  then turned to Pilley and made the "f–ing Filipino" comments. (*Id.*). After Peterson and Pilley

4  left, Plaintiffs went back to work. (*Id.*). At around 8:30 a.m., Plaintiffs were asked to go to HR.

5  (*Id.*).

6  Aranda testified that at the HR meeting she, Bates, Peterson, and some other guy were

7  there. (*Id.* at 26). Olive was not there. (*Id.*). Aranda tried to explain that she was not sleeping

8  but Bates wanted her to sign the termination papers . (*Id.*). Aranda called Peterson a "liar"

9  during the meeting and said "you know we were not sleeping.  You didn't see us sleeping."

10  (*Id.*). She did not remember whether or not she had mentioned that she felt that Peterson was

11  discriminating against her based on national origin during that meeting. (*Id.* at 26-27).

12  Aranda testified that, through gossip, she had heard that Bates did not like Filipinos

13  because Bates never gave Filipinos or Mexicans a chance to explain. (*Id.*). Aranda stated

14  that Elvira Cano had told her that Peterson had caught Cano sleeping but told her to go back

15  to work and did not fire her. (*Id.* at 28). Aranda thought that Peterson disliked people who did

16  not speak English. (*Id.*).

17  Gina Brock testified to the following at her deposition.  (Brock Depo. Ex. 5 (#25-3) at

18  3). After she and Aranda had exited the break room, Brock asked Peterson, "Who is sleeping,

19  Pete?" (*Id.* at 4). Peterson responded, "Both of you are sleeping." (*Id.*). Brock stated, "we're

20  not sleeping . . . Can you see I'm drinking my coffee." (*Id.*). Peterson responded that they

21  were "both sleeping on the job." (*Id.*). Brock then said "we need to go to Alan Olive." (*Id.*).

22  Peterson was screaming in their faces and Brock told him not to treat them like animals. (*Id.*).

23  Peterson said, "going to Alan Olive, I guarantee you . . . you both can lose your job." (*Id.*).

24  Plaintiffs looked at each other. (*Id.*). Peterson then turned to Pilley and said, "I hate F'ing

25  Filipinos" and "I'm sick and tired of Filipinos." (*Id.*). Aranda did not say anything that night.

26  (*Id.*).

27  Brock testified that, at meetings, Peterson was aggressive to all employees, which

28  included both Filipinos and Hispanics. (*Id.* at 5). Someone told Brock that Peterson had hired

6

white people to replace them. (*Id.* at 6). She believed Peterson did not like Filipinos and Hispanics because they could not speak English and he told them at the meetings that they needed to speak English. (*Id.* at 6-7). Brock alleged that Peterson discriminated against both Filipinos and Hispanics. (*Id.* at 8). Brock's discrimination claim was based on the events of June 13th. (*Id.* at 9). Her retaliation claim was based on Peterson's response that "I guarantee you, going to Alan Olive, I guarantee you are going to lose your job," after she mentioned Olive. (*Id.*). Brock did not tell Peterson that she wanted to go to Olive to complain about harassment or discrimination. (*Id.*). Brock wanted to talk to Olive about Peterson's behavior that night, including screaming at them and not listening to them. (*Id.*). She never mentioned harassment based on race or national origin. (*Id.* at 10). Brock was born in the Philippines. (*Id.* at 12). She had never heard Peterson make any other derogatory remarks based on race or national origin other than the remarks on June 13th. (*Id.* at 24). She had never complained to anyone at Renown that Peterson had discriminated against her based on her race or national origin. (*Id.* at 29). On June 13th, she was holding her coffee cup while watching television. (*Id.* at 33). She did not have her eyes closed. (*Id.*). Elvira Cano was Hispanic. (*Id.* at 40).

Pursuant to Renown's written policy on discipline and appeal, leaders were encouraged to use progressive discipline under ordinary circumstances but suspension or termination could be a first step depending on the severity of the incident. (Renown Health Policy, Ex. 8 (#25-4) at 12). The progressive steps included verbal corrective action, written corrective action, suspension, termination, demotion, and reassignment. (*Id.* at 13-14). Sleeping while on duty was a Type C Offense whereby the disciplinary process usually began with a suspension or termination. (*Id.* at 16, 18). In order to terminate a person during normal business hours, the employee's leader had to consult the HR Business Partner. (*Id.* at 19).

In her declaration, Elvira Cano declared that she had never told Plaintiffs that Peterson found her sleeping on duty because it had never happened. (Cano Decl. Ex. 12 (#25-5) at 2, 5). In his declaration, Luiz Russi declared that he had seen Plaintiffs sleeping during their shift on multiple occasions outside of designated break times. (Russi Decl. Ex. 14 (#25-5) at 11).

1   Four months before Plaintiffs' terminations, Russi told Peterson that he had seen Plaintiffs

2   sleeping while on duty.  (*Id.* at 12).

3       An email from Peterson to Alan Olive and copied to Diane Bates on June 13, 2007, at

4   3:49 a.m. stated the following.  (Peterson Email Ex. 16 (#25-5) at 19).  Peterson had come to

5   work to give Plaintiffs computer training, to check on the night shift, and to do a walk through.

6   (*Id.*).  He had asked Pilley to go with him to get the ladies for training.  (*Id.*).  When Peterson

7   and Pilley got to the break room, the door was closed and the lights were off.  (*Id.*).  When

8   Peterson attempted to open the door, it was blocked and he was unable to open it more than

9   18 inches.  (*Id.*).  Plaintiffs were in "almost prone positions with [their] feet up on the furniture

10  and blankets over their chest and shoulders" and appeared to "have been woken."  (*Id.*).

11  Peterson had asked Plaintiffs three times to unblock the door and come out.  (*Id.*).  During the

12  time that he was waiting for them, Plaintiffs were speaking Tagalog and did not respond.  (*Id.*).

13  Peterson advised them that sleeping on the job, even on break, was a terminable offense and

14  told them that he would be preparing verbal warnings for them.  (*Id.*).  Brock advised him that

15  "[m]aybe we need to have a meeting with Alan and everybody."  (*Id.*).  Peterson said that was

16  "fine" and "we could do that but it may mean they would receive more than a verbal warning."

17  (*Id.*).

18      An email from Bates to Peterson dated June 13, 2007, at 7:40 a.m. stated that "they

19  will be [terminated] today –correct?  They should have been sen[t] home–fired on the spot."

20  (Bates Email Ex. 19 (#25-5) at 28).

21      An email from Bates to Peterson and Olive on June 13, 2007, at 7:45 a.m., stated

22  "Verbal warnings??? Absolutely not.  We have received previous reports of them sleeping and

23  now you have confirmed it to be true. They should be fired immediately." (Bates Email Ex. 19

24  (#25-5) at 27).

25      An email from Olive to Bates and Peterson dated June 13, 2007, at 10:05 a.m. stated

26  the following.  (Olive Email Ex. 19 (#25-5) at 25).  The minimum corrective action should be

27  a final written warning.  (*Id.*).  Olive believed that there was enough evidence including "eye

28  witness, multiple reports of this as well as attitude" to support termination.  (*Id.*).  Olive

1    instructed Peterson to let him "know what support [his] team need[ed] to . . . proceed with

2    termination." (*Id.*).

3        Plaintiffs' termination notices stated that they had violated the sleeping while on duty

4    policy. (Notice of Corrective Action Ex. 20 (#25-5) at 30, 32). The terminations were effective

5    June 13, 2007, and signed by both Peterson and Bates. (*Id.* at 31, 33). Plaintiffs refused to

6    sign the forms. (*Id.*).

7                                  **LEGAL STANDARD**

8        In reviewing a motion for summary judgment, the court construes the evidence in the

9    light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.

10   1996). Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows

11   that there is no genuine dispute as to any material fact and the movant is entitled to judgment

12   as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome

13   of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

14   S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such

15   that a reasonable jury could return a verdict for the nonmoving party. *Id.*

16       The moving party bears the initial burden of identifying the portions of the pleadings and

17   evidence that the party believes to demonstrate the absence of any genuine issue of material

18   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

19   (1986). A party asserting that a fact cannot be or is genuinely disputed must support the

20   assertion by "citing to particular parts of materials in the record, including depositions,

21   documents, electronically stored information, affidavits or declarations, stipulations (including

22   those made for purposes of the motion only), admissions, interrogatory answers, or other

23   materials" or "showing that the materials cited do not establish the absence or presence of a

24   genuine dispute, or that an adverse party cannot produce admissible evidence to support the

25   fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the

26   motion, the burden shifts to the nonmoving party to come forward with specific facts showing

27   that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

28   U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a

1    scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

2    evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252,

3    106 S.Ct. at 2512.  The nonmoving party cannot defeat a motion for summary judgment "by

4    relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d

5    1040, 1045 (9th Cir. 1989).  "Where the record taken as a whole could not lead a rational trier

6    of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475

7    U.S. at 587, 106 S.Ct. at 1356.

8                                   **DISCUSSION**

9    **I.     National Origin Discrimination**

10           Defendant moves for summary judgment on all of Plaintiffs' remaining claims.  (Mot. for

11   Summ J. (#25) at 1).  Defendant argues that Plaintiffs cannot show discrimination based on

12   race or national origin and note that Plaintiffs appear to present their discrimination claim as

13   one and the same claim.  (*Id.* at 24).  Defendant asserts that both Aranda and Brock's

14   discrimination claims rest solely on Peterson allegedly stating that he hated "f----ing Filipinos"

15   and was "sick and tired of f---ing Filipinos" on June 13, 2007.  (*Id.*).  Defendant argues that

16   Plaintiffs cannot make out a prima facie case under *McDonnell Douglas* because Plaintiffs fail

17   to establish the second and fourth prongs.  (*Id.* at 28).  Defendant asserts that Plaintiffs were

18   not meeting Renown's legitimate expectations at the time of termination because there had

19   been reports that Plaintiffs were sleeping on duty and Peterson observed circumstances that

20   led him to believe that they were sleeping on duty in violation of Renown's policy.  (*Id.* at 28-

21   29).  Defendant asserts that Plaintiffs have no evidence that similarly situated employees

22   outside of their class were treated differently.  (*Id.* at 29).  Defendant contends that Plaintiffs

23   allege that Peterson discriminated against non-whites in general  and that Plaintiffs provide

24   no proper comparators because the comparators are both Hispanic.  (*Id.*).  Additionally,

25   Defendant asserts that, if Plaintiffs are alleging discrimination against Filipinos only, they only

26   provide inadmissible hearsay to support their claim.  (*Id.*).  Defendant also asserts that

27   Plaintiffs cannot establish that Defendant's non-discriminatory business reason that Plaintiffs

28   were sleeping on duty was pretextual.  (*Id.* at 30).

1    In response, Plaintiffs argue that their claim is for national origin discrimination and

2    apply *McDonnell Douglas*.  (Opp'n to Mot. for Summ. J. (#27) at 9).  Plaintiffs argue that they

3    were qualified to work as housekeepers and that they had been doing that job satisfactorily

4    for a lengthy period of time before they were discharged, they were terminated, and were

5    replaced by non-Filipinos.  (*Id.* at 10).  Plaintiffs argue that they can prove that Defendant's

6    explanation is pretextual because they can offer direct evidence of Peterson's discriminatory

7    intent based on his Filipino comments and his obsession with speaking English-only.  (*Id.* at

8    12-14).    Plaintiffs argue that English-only rules are presumptively illegal and that it

9    demonstrates Peterson's bias against foreign born employees. (*Id.* at 14).

10    In reply, Defendant argues that Plaintiffs' qualifications are evaluated as whether they

11    met their employer's legitimate expectations.  (Reply to Mot. for Summ. J. (#28) at 14).

12    Defendant asserts that Plaintiffs are changing their theories throughout this lawsuit by first

13    alleging that others outside of their class where caught sleeping but not discharged.  (*Id.*).

14    Defendant contends that Plaintiffs are now arguing that non-Filipinos replaced them.  (*Id.* at

15    14-15).  Defendant asserts that if the Court applies the similarly-situated standard Plaintiffs

16    cannot demonstrate that comparators were treated better.  (*Id.* at 15).  Defendant argues that

17    if the Court considers Plaintiffs' replacements they cannot meet the test for discrimination

18    because Plaintiffs were replaced by a Caucasian and a Hispanic.  (*Id.*).  However, Defendant

19    contends that this evidence does not demonstrate national origin discrimination because race

20    and national discrimination origin are different concepts.  (*Id.*).  Defendant asserts that

21    Plaintiffs cannot demonstrate pretext for national origin discrimination because the English-

22    speaking requirement did not originate with Peterson and was enforced among all foreign

23    language speakers.  (*Id.* at 16).

24    As an initial matter, although Plaintiffs' complaint uses race and national origin

25    discrimination interchangeably, Plaintiffs' opposition to the motion for summary judgment

26    specifically states that their claim is for national origin discrimination.  (*See* Opp'n to Mot. for

27    Summ. J. (#27) at 9).  Additionally, Plaintiff only relies on the *McDonnell Douglas* framework.

28    (*See id.*).  Therefore, this order only addresses national origin discrimination through the

11

1   *McDonnell Douglas* framework.

2       Title VII makes it unlawful for an employer to discriminate against any individual with

3   respect to her compensation, terms, conditions, or privileges of employment because of such

4   individual's national origin.  42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case of

5   discrimination under Title VII, a plaintiff must offer proof that: (1) the plaintiff belongs to a class

6   of persons protected by Title VII; (2) the plaintiff performed his or her job satisfactorily; (3) the

7   plaintiff suffered an adverse employment action; and (4) the plaintiff's employer treated the

8   plaintiff differently than a similarly situated employee who does not belong to the same

9   protected class as the plaintiff.  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028

10  (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817,

11  36 L.Ed.2d 668 (1973)).  "To rebut this presumption, the defendant must produce admissible

12  evidence showing that the defendant undertook the challenged employment action for a

13  'legitimate, nondiscriminatory reason.'"  *Id.*  If the employer meets that burden "the plaintiff

14  bears the full burden of persuading the factfinder that the employer intentionally discriminated

15  against him."  *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005).

16      "A plaintiff may meet the burden to show pretext using either direct or circumstantial

17  evidence."  *Id.* at 1094-95.  "Direct evidence is evidence 'which, if believed, proves the fact

18  [of discriminatory animus] without inference or presumption.'" *Id.* at 1095.  "Direct evidence

19  typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by

20  the employer."  *Id.*

21      In viewing the evidence in the light most favorable to Plaintiffs, they fail to establish a

22  prima facie case for national origin discrimination.  Although both women are Filipino from the

23  Philippines and Defendant did terminate them, Plaintiffs fail to establish that they were

24  performing their jobs satisfactorily.  Peterson had been aware of previous complaints that

25  Plaintiffs had been caught sleeping while on duty and then observed circumstances that led

26  him to believe that they were sleeping on duty.  As such, Plaintiffs cannot establish that they

27  met Renown's legitimate expectations and were performing their jobs satisfactorily.  *See*

28  *Mahomes v. Potter*, 590 F.Supp.2d 775, 782 (D. S.C. 2008) (finding that "it is the employer's

1   perception of job performance, and not the employee's perception, that is controlling").  With

2   respect to the fourth prong, Plaintiff fails to establish national origin evidence on any of the

3   alleged comparators.  Additionally, Plaintiffs believed that Peterson discriminated against all

4   non-Caucasians but state that he replaced them with Hispanics and Caucasians.  Therefore,

5   the Court finds that Plaintiffs fail to state a prima facie case for national origin discrimination.

6         Even if Plaintiffs could establish a prima facie case, Defendant meets its burden of

7   providing a legitimate, nondiscriminatory reason for Plaintiffs' terminations, namely, that

8   Peterson caught Plaintiffs sleeping while on duty, a terminable offense.

9         Even assuming that Peterson made the statements "I hate fucking Filipinos" and "I'm

10  sick and tired of Filipinos," Plaintiffs cannot establish pretext in light of Bates and Olive's

11  emails on the day of termination.  The emails demonstrate that Bates and Olive wanted

12  Peterson to terminate Plaintiffs for sleeping on duty.  The emails make no reference to

13  Plaintiffs' national origins.  Accordingly, the Court grants summary judgment on Plaintiff's

14  national origin discrimination claims.

15  **II.    Retaliation**

16        Defendant argues that Plaintiffs' retaliation claims fail as a matter of law because

17  Plaintiffs cannot establish a prima facie case of retaliation or meet the applicable burden-

18  shifting analysis.  (Mot. for Summ. J. (#25) at 16).  As to Aranda, Defendant asserts that her

19  sole basis for her retaliation claim is that Renown terminated her based on Brock's desire to

20  see Alan Olive in connection with the June 13, 2007, incident.  (*Id.*).  Defendant asserts that

21  Aranda did not say anything about the subject and, therefore, did nothing that could be

22  deemed an opposition to a discriminatory practice under Title VII.  (*Id.* at 17).  Defendant

23  alleges that Aranda's mere presence during Brock's statement does not amount to protected

24  activity under Title VII and her claim fails.  (*Id.*).  Defendant contends that, even if Aranda

25  could establish that her mere presence could indirectly be deemed an opposition to a

26  particular practice, Brock did not engage in any protected activity.  (*Id.*).  As to Brock,

27  Defendant asserts that she bases her retaliation claim on the fact that she mentioned going

28  to see Olive on June 13th and that Peterson guaranteed that she was going to lose her job if

1    she did.  (*Id.* at 16).  Defendant notes that Brock did not tell Peterson that she wished to go

2    to Olive to complain about harassment or discrimination nor did she tell Peterson that he had

3    engaged in harassment or discrimination.  (*Id.* at 17).    Defendant argues that Brock's

4    statements never rose to the level of opposing a discriminatory practice, and therefore the

5    claim fails as a matter of law.  (*Id.* at 18).  Defendant argues that Plaintiffs cannot establish a

6    causal link between any protected activity and their terminations because they do not offer any

7    evidence linking Brock's statement that she wanted to have a meeting with Olive to their

8    subsequent terminations.  (*Id.*).  Defendant argues that Bates increased the verbal warning

9    to termination and that Plaintiffs have not provided admissible evidence that Bates harbored

10   any discriminatory or retaliatory animus against them.  (*Id.*).  Defendants also argue that they

11   had a legitimate, non-discriminatory business reason to terminate Plaintiffs and that Plaintiffs

12   cannot show pretext.  (*Id.* at 19-24).

13         In response, Plaintiffs argue that Peterson "fired them in retaliation for Brock's

14   statement that [Plaintiffs] would go to [Olive] after Peterson accused them of sleeping while

15   on duty."  (Opp'n to Mot. for Summ. J. (#27) at 16).  They assert that Brock's comment

16   demonstrated that she was opposing illegal conduct because "Peterson clearly retaliated

17   against [Plaintiffs] because of Brock's comments . . . [and Brock's] comment followed Aranda's

18   complaint in late 2006 and Peterson's numerous threats that his housekeeping staff not go to

19   Olive with their complaints."  (*Id.* at 17-18).  They assert that Aranda's email and meeting with

20   Olive in late 2006 was an objection to an English-only rule and that Brock's threat to go to

21   Olive in June 2007 was a follow up to Aranda's original complaint.  (*Id.* at 18).

22         In reply, Defendant asserts that Plaintiffs are attempting to change the basis for their

23   retaliation claim by trying to allege that Brock's statement was a follow up to Aranda's 2006

24   complaint.  (Reply to Mot. for Summ. J. (#28) at 8).  Defendant states that Plaintiffs' deposition

25   testimonies state that the sole bases for their retaliation claims were Brock's desire to speak

26   to Olive regarding the June 13, 2007, incident.  (*Id.*).  Defendant contends that there is no

27   admissible evidence that Brock was "following up" on Aranda's complaint.  (*Id.*).

28         An employer cannot retaliate against an employee for "oppos[ing] any practice made

                                                14

an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation, a plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two." *Surrell v. Cal. Water Service Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). "Once established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation." *Id.*

A "complaint by an employee that a supervisor has violated Title VII may constitute protected activity for which the employer cannot lawfully retaliate." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009). "The employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to some practice by the employer that is allegedly unlawful." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983). However, it is not necessary "that the practice be demonstrably unlawful" because "opposition clause protection will be accorded whenever the opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice." *Id.*

In this case, neither Brock nor Aranda can establish a prima facie case for retaliation because neither of them can establish that they had engaged in protected activity. With respect to Brock, she only stated that she wanted to speak to Olive because of Peterson's aggressive/screaming behavior and statements that sleeping on the job was a terminable offense. Brock made no reference to the fact that she wanted to speak to Olive because Peterson was harassing or discriminating against Plaintiffs because they were Filipino. Therefore, Brock's statement did not refer to any allegedly unlawful employment practice. Moreover, Peterson's alleged statement about "f—ing Filipinos" did not occur until after Brock had made the Alan Olive statement and, thus, her statement could not have been made in reference to Peterson's Filipino comment. Accordingly, the Court grants the motion for summary judgment on Brock's retaliation claim.

With respect to Aranda, she made no statement during the confrontation with Peterson and therefore she did not make any statement to oppose an unlawful employment practice.

15

Additionally, to the extent that Aranda attempts to argue that she engaged in protected activity during her January 2007 meeting with Olive, she admits that she did not tell Olive that Peterson was harassing or discriminating against her because she was Filipino. Moreover, six months had passed between her meeting with Olive and her termination and, thus, there was no causal connection between the two events.  Accordingly, the Court grants the motion for summary judgment on Aranda's retaliation claim.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED in its entirety.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment accordingly.

DATED: This      26th      day of July, 2011.

_____
United States District Judge